# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-60069

United States Court of Appeals
Fifth Circuit

**FILED**
March 14, 2016

Lyle W. Cayce
Clerk

ADVANCED TECHNOLOGY BUILDING SOLUTIONS, L.L.C.;
DONALD HEWITT, "Don,"

Plaintiffs–Appellants,

versus

CITY OF JACKSON, MISSISSIPPI,

Defendant–Appellee.

Appeal from the United States District Court
for the Southern District of Mississippi

Before JONES and SMITH, Circuit Judges, and BOYLE, District Judge.*
JERRY E. SMITH, Circuit Judge:

Advanced Technology Building Solutions, L.L.C. ("ATBS"), and Donald
Hewitt, its owner, brought a First Amendment retaliation claim against the
City of Jackson, alleging that the mayor, acting through city employees, ended

---

* District Judge of the Northern District of Texas, sitting by designation.

No. 15-60069

support for a development project proposed by ATBS after Hewitt had made public statements claiming corruption in city government. Because the city council was the final policymaker with ultimate authority to approve (or reject) project funding, we affirm the judgment as a matter of law ("JML") in favor of the city.

I.

Through his company, ATBS, Hewitt wanted to redevelop a bank building in Jackson, seeking support and approval from the city. He reached out to the Joint Redevelopment Authority ("JRA"), a distinct public entity, which is tasked with investing in urban renewal projects. *See* MISS. CODE ANN. §§ 43-35-31, 43-35-33 (2015). He received initial support that was memorialized in a letter. The JRA and ATBS also entered into a memorandum of understanding whereby the JRA pledged to "use its best efforts to pursue issuance" of $5 million in bonds, which would be turned into a loan to ATBS to fund the project. Support for the project stalled in the JRA's finance committee and never made it to the city council, which would have had to give approval of the funding.[1]

The city claims the project failed to move forward because of concerns regarding the city's ability to take on more debt through the issuance of bonds and because ATBS never provided certain financial documents. ATBS contends that the project was stopped by the mayor (acting through city and JRA employees) in retaliation for statements Hewitt had made to local press about cronyism in the mayor's office in regard to a different Jackson development project (a convention center and hotel), which Hewitt had bid for and lost

---

[1] The JRA is statutorily prohibited from issuing bonds. *See* MISS. CODE ANN. § 43-35-31(b).

2

No. 15-60069

despite offering a less expensive proposal.

ATBS and Hewitt sued the city under 42 U.S.C. § 1983, alleging a variety of constitutional claims. After a four-day trial on allegations of First Amendment retaliation, the jury found in favor of ATBS and Hewitt and awarded $600,000. Jackson moved for judgment notwithstanding the verdict, contending that the mayor lacked final policymaking authority for the city and thus could not subject it to liability for his actions. The district court construed that as a request for JML under Federal Rule of Civil Procedure 50(b) and granted a JML, determining that the city council was the final policymaker in regard to funding.

## II.

We review a JML d*e novo*, applying the same standard as did the district court. *Weiser-Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 513, 525 (5th Cir. 2015); *Laxton v. Gap Inc.*, 333 F.3d 572, 577 (5th Cir. 2003). JML is appropriate when "a party has been fully heard on an issue during a jury trial and . . . a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a)(1). We "draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence." *Laxton*, 333 F.3d at 577 (alteration in original) (quoting *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000)). Nevertheless, we are permitted to give "credence to evidence supporting the moving party that is uncontradicted and unimpeached if that evidence comes from disinterested witnesses." *Id.*

## III.

Parties can sue a municipality that has violated their constitutional rights "under color of any statute, ordinance, regulation, custom, or usage."

No. 15-60069

42 U.S.C. § 1983 (2015); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (holding that municipalities are "persons" for purposes of § 1983). Thus, ordinarily, municipal liability must be based on "an official policy." *Monell*, 436 U.S. at 694. In *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986), the Court further explained that a "single decision" by an authorized policymaker may represent "an act of official government policy." Nevertheless, "liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* at 481. "The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Id.* at 481–82. Indeed, a municipality cannot be liable for the actions of its employees under the theory of *respondeat superior*. *Monell*, 436 U.S. at 691. Thus, the critical question is to decide who is the final policymaker, which is an issue of state law. *See Jett v. Dall. Indep. Sch. Dist.*, 7 F.3d 1241, 1245 (5th Cir. 1993).

## A.

All of the evidence of alleged wrongdoing centered on Jackson's mayor. Thus, as both parties acknowledge, the critical question is whether he or the city council is the final policymaker in regard to funding decisions. ATBS and Hewitt contend that under Mississippi law the mayor is the final policymaker because he has "superintending control of all the officers and affairs of the municipality." MISS. CODE ANN. § 21-8-15.

That theory carries little weight. Apart from any control that the mayor might exercise over city employees, both sides agree that the city council's approval would have been required for the issuance of any bonds or the expenditure of public funds for ATBS's project. The city points to Mississippi law, which confers the "legislative power" of a municipality on the city council. *Id.*

4

§ 21-8-9. The statute does not define explicitly whether the power of the purse is legislative or executive, but the city cites an opinion of the Mississippi Attorney General explaining that "the power to appropriate funds through a budget is a fundamental legislative power." *In re McNeil*, 1990 WL 547708, at *2 (Miss. A.G. Feb. 8, 1990). Thus, according to that opinion, it is the city council, not the mayor, that has final say over funding decisions. *Id.*

Under Mississippi law, "Attorney General opinions are not binding," though "they are certainly useful in providing guidance to [courts]."[2] We need not decide the persuasiveness of the Mississippi Attorney General's conclusion, however, because ATBS and Hewitt concede that the "Council would ultimately have had to approve any contract or agreement for project funding."

Thus, by ATBS's own admission, the city council holds the power of the purse. The obvious conclusion is that the city is likewise the final policymaker for funding decisions. It is true that the mayor can veto council resolutions (and every ordinance passed by the council must be submitted to the mayor for approval or rejection); nevertheless, the council can override a veto, thus giving the council ultimate say. *See* MISS. CODE ANN. § 21-8-17(2). Because the council has the right of final review, it is the final policymaker.

This conclusion is consistent with cases in which we have found reviewability by another political body "relevant to showing that an official is *not* a final policymaker." *Bolton v. City of Dall.*, 541 F.3d 545, 550 n.4 (5th Cir. 2008) (per curiam). Indeed, in *Worsham v. City of Pasadena*, 881 F.2d 1336, 1337, 1340–41 (5th Cir. 1989), where the mayor had suspended a city employee and the city council later reinstated him, we held that the mayor was not a final

---

[2] *Shelter Mut. Ins. Co. v. Dale*, 914 So. 2d 698, 703 (Miss. 2005) (quoting *In re Assessment of Ad Valorem Taxes on Leasehold Interest Held by Reed Mfg., Inc. ex rel. Itawamba Cty. Bd. of Supervisors*, 854 So.2d 1066, 1071 (Miss. 2003)).

policymaker for purposes of *Monell* liability. "[M]eaningful review by the City Council indicates that the [mayor] . . . w[as] not . . . [a] final policymaker[]. *Id.* at 1341. Thus, we agreed with the Eighth Circuit that "the existence of effective review procedures" could prevent "employees from wielding final responsibility." *Id.* (citing *Williams v. Butler*, 863 F.2d 1398 (8th Cir. 1989) (en banc)).

Likewise, in *Barrow v. Greenville Independent School District*, 480 F.3d 377, 381–82 (5th Cir. 2007), we held that a school superintendent, who had the "sole authority" to make personnel recommendations to the school board, was not a final policymaker when the board could reject those recommendations, even though it had statutory power to delegate final authority over personnel decisions to the superintendent. Similarly, in *Beattie v. Madison County School District*, 254 F.3d 595, 603 (5th Cir. 2001), we held that a superintendent was not a final policymaker when she merely presented her recommendation of an employee's termination to the board, which effected the actual termination.

Thus, in multiple cases, we have affirmed that officials are not final policymakers when a supervisory board has the authority to accept or reject their decisions. In contrast, in *Brady v. Fort Bend County*, 145 F.3d 691, 700 (5th Cir. 1998), we held that a sheriff was the final policymaker when his exercise of discretion was "unreviewable by any other official or governmental body in the county." Reviewability can be a significant factor when determining whether a public employee is a final policymaker.

Although in *Gelin v. Housing Authority of New Orleans*, 456 F.3d 525, 530 (5th Cir. 2006), we interpreted *Jett* to "eschew[] the importance of administrative reviewability in distinguishing final decisionmaking authority from final policymaking authority," we nevertheless affirmed the relevance of "effective administrative review" in "certain contexts." It is important not to

No. 15-60069

over-read our interpretation of *Jett* in *Gelin*. *Jett* dealt with the opposite situation—whether someone could have unreviewable decisionmaking authority and still not be a final policymaker. *See Jett*, 7 F.3d at 1246. Thus, in *Jett*, the school board had exercised its statutory ability to delegate individual employee transfer decisions to the superintendent; nevertheless, we held that giving the superintendent final say over an individual transfer did not constitute final policymaking authority over *all* transfers, so that policymaking power remained with the board. *Id.* at 1246, 1251.

Therefore, *Jett* covered a situation in which reviewability did not exist; it did not in any way overrule *Worsham* or undermine the significance of supervisory review (where it exists) in determining whether someone is a final policymaker. We reaffirm our conclusion in *Gelin*, which was also stated in *Bolton*: Review procedures are relevant to show that someone "is *not* a final policymaker." *Bolton*, 541 F.3d at 550 n.4; *see also Gelin*, 456 F.3d at 530.

The Eleventh Circuit reached a similar conclusion. In *Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 637–38 (11th Cir. 1991), the court held that a mayor was not the final policymaker in regard to zoning matters when the city council was required to approve all zoning changes and could override the mayor's veto. Notably, the mayor actually did veto a zoning ordinance that had been approved by the council, and the council failed to override it, yet the court concluded that because the council *could* override the veto, the mayor was not the final policymaking authority. *Id.* at 638; *see also Williams*, 863 F.2d at 1402 (stating that where "the right of review is retained" the actions of a government official "will not result in municipal liability").

B.

ATBS and Hewitt also imply, without citations to the record or any authority, that *in practice* the mayor of Jackson has been the final policymaker

7

in regard to public financing, regardless of his official relationship with the council.[3] According to ATBS and Hewitt, the mayor continued that practice by instructing the executive director of the JRA to reject ATBS's funding proposal, so he effectively functioned as the final policymaker.

ATBS's notion has scant legal support. Although JRA's commissioners are appointed by the mayor (with the "advice and consent" of the council), they can be removed only "[f]or inefficiency or neglect of duty or misconduct in office" after notice and a hearing. MISS. CODE ANN. § 43-35-33(b), (d). Thus, the JRA appears to be an independent agency, limiting the mayor's power over it.[4] Additionally, the JRA hires its own executive director, who appears to answer to the commissioners rather than the mayor. *Id.* § 43-35-33(c). Even if the mayor could direct the executive director of the JRA (he does have supervisory authority over city employees), it is the JRA commissioners, not its executive director, who make the actual decisions regarding which projects to support. *See id.* §§ 21-8-15, 43-35-33(c). In summary, the mayor's statutory authority to influence the JRA is constrained.

Even if the mayor held personal sway over the JRA and was, in practice, making funding decisions for the city, we have explicitly rejected the concept of *de facto* authority, as has the Supreme Court. *See Gelin*, 456 F.3d at 530 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988)). Thus, assuming *arguendo* that ATBS and Hewitt's factual allegations are true, because the city

---

[3] According to ATBS and Hewitt, "contracts and agreements that relate to public finance have *never* been introduced for consideration, negotiation, or adoption by the City Council," and the "City's ability to issue bonds and public financing . . . falls solely under the purview of the Mayor." (Emphasis added.)

[4] *Cf. Bowsher v. Synar*, 478 U.S. 714, 725 n.4 (1986) (quoting 15 U.S.C. § 41) (explaining that the "statutes establishing independent agencies typically specify . . . that the agency members are removable by the President for specified causes" such as "inefficiency, neglect of duty, or malfeasance in office").

council has final policymaking authority over funding, the city cannot be held liable for the mayor's actions.

ATBS and Hewitt further claim that the mayor "has the sole discretion" to place action items on the city council agenda and the sole ability to negotiate contracts on behalf of the city. Thus, they contend that the mayor was acting as the final policymaker because he could stop the redevelopment project from ever reaching the council. Assuming again that those contentions are correct, this is similar to the situation in *Barrow*, 480 F.3d at 379, 381, in which the superintendent had the sole discretion to make personnel recommendations to the board and declined to recommend the plaintiff to be an assistant principal. Nevertheless, in *Barrow*, because the board retained policymaking authority over hiring decisions—such as the duty to specify qualifications for a principal—in addition to the ability to accept or reject the superintendent's recommendations—we determined that it was the board that was the final policymaker. *Id.* at 381–82.

Likewise, here there is no doubt that the city council, which is responsible for approving the issuance of bonds, has final policymaking power with respect to funding decisions, notwithstanding any role the mayor may play in negotiating individual development projects and bringing them to the council's attention. Thus, the mayor's ability to stop a project at lower levels of governance is irrelevant for purposes of liability.

Indeed, even if the council lacked the ability to review the mayor's decisions in regard to individual projects, given the council's power over the budget, it is still unlikely that the mayor could be considered the final policymaker in regard to city funding. *See Jett*, 7 F.3d at 1246. "[A]n official whose discretionary decisions on a particular matter are final and unreviewable, meaning they can't be overturned, is constrained if another entity has ultimate power

to guide that discretion, at least prescriptively, whether or not that power is exercised." *Barrow*, 480 F.3d at 382.

The mayor did not have final authority over individual funding decisions. Despite ATBS and Hewitt's claim that only the mayor could put items on the agenda, testimony from the former council president revealed that any member could place items on the agenda.[5] ATBS and Hewitt have failed to point to any facts indicating the opposite; instead they cite a state statute. Although Mississippi law does direct the mayor to make "recommendations for action by the council," it does not state that *only* he can suggest action for the council. MISS. CODE ANN. § 2-8-17(1). Thus, the contention that the mayor was the final policymaker because he had the sole discretion to bring development projects to the council's attention is without foundation.[6]

AFFIRMED.

---

[5] Because that witness was the *former* president of the council, he does not have a stake in this litigation and thus appears to be a disinterested witness. *See Laxton*, 333 F.3d at 577. Additionally, though neither party cites it, the city code confirms his testimony. *See* JACKSON, MISS., MUN. CODE § 2-63 (2001), https://www.municode.com/library/ms/-jackson/codes/code_of_ordinances?nodeId=COOR_CH2AD_ARTIICICO_DIV2ME_S2-63AG (providing that city council members, the mayor, the city attorney, and "directors of departments" can place items on the council's agenda).

[6] It does not matter that the city council never actually considered funding for ATBS's project. The point is what this legal structure reveals about who has final policymaking authority, not whether those supervisory powers are always utilized. *See Barrow*, 480 F.3d at 382. ATBS and Hewitt have not claimed that the council was somehow negligent for failing to review the mayor's actions.